# HARRY FAHNESTOCK et al., Trustees, *vs.* FREDERICK W. FELDNER et al.

*Water-courses—Obstruction of Flow of Stream by Lower Riparian Owners—Use of Stream in a City for Carrying off House Drainage—Mandatory Injunction—Jurisdiction of Equity.*

A stream of water fed by springs rose on the plaintiffs' tract of land in Baltimore City and flowed thence over parcels of land owned by the defendants. More than twenty years ago plaintiffs built houses on their land and the house-drainage from these, but not the sewage of the water-closets emptied into this stream. The defendants in a variety of ways obstructed the flow of the stream and caused a pond of stagnant water to be formed which covered about three-quarters of an acre of the plaintiffs' land. The bill in this case asked for an injunction prohibiting the defendants' from further obstructing the flow of the water and commanding them to remove the existing obstructions. The evidence established the existence of the natural stream and its obstructions by the defendants. *Held*, that the use of the stream by the plaintiffs for carrying off the drainage from houses and kitchens, but not from water-closets, was not unlawful under the circumstances of this case; that such use does not disentitle the plaintiff to relief in equity and that the defendants should be required to remove the obstructions and construct outlets to carry off the water accumulated on plaintiffs' land.

*Held*, further, that the defendants, who had made or allowed the obstructions to be made were not entitled to receive notice of the injury complained of by the plaintiffs before suit could be brought.

When the owners of different parcels of land in various ways obstruct the flow of a stream of water from plaintiffs' land equity has jurisdiction of a suit to require them to co-operate in restoring the flow of water.

The use of a natural stream of water in a city for the purpose of carrying off the drainage from houses, but not from water-closets, is not an unlawful use when the water is not used for any purpose by the lower riparian owners.

The fact that lower riparian owners so graded their land as to divert and cover up the natural course of a stream affords no reason why they should not be required to remove the obstructions which caused the water to overflow the land of an upper riparian owner.

Appeal from a decree of the Circuit Court of Baltimore City (SHARP, J.)

The cause was argued before McSherry, C. J., Fowler, Page, Pearce, Schmucker and Jones, JJ.

*W. Burns Trundle* and *Edgar H. Gans* (with whom was *Edwin T. Dickerson* on the brief), for the appellants.

1. The stream in question is a water-course.

2. As to the easement of the flow of water therein, the land of the appellants is the dominant, the lands of the appellees to the eastward are the servient heritages. The owners of the dominant heritage have the right to have the water accummulating on their land flow therefrom to the servient heritages to the eastward, as freely and unobstructed as it would do in a state of nature, unless they have done some act to forfeit that right.

3. The appellants, and their predecessors in title, have done no act to forfeit that right. The contention of the appellees is that the water in the stream is now polluted by human sewage. There is no proof in the record that the appellants have at any time caused or permitted any human sewage to flow into the stream. The burden is upon the appellees to show, not only that the appellants have done some act to injure the stream, and which they have no legal right to do, or which is in excess of their legal right so as to be an unreasonable use thereof, but also that the detriment, on which the appellees rely as a defense to the relief prayed, is the result of that cause.

4. The only use to which said water-course has been put for the last 28 or 29 years, or can now, or in the future reasonably be put, is as a drain. The record shows that nothing but house-drainage, and that without objection from any one, has flowed into said drain during that entire period. The flowage of house-drainage from the dwellings on the appellants' land into said stream is not an unreasonable use of said stream; nor is it injurious to the appellees, considering the purposes for which the stream has been used, in its course through the lands of the appellees, during that long period, being the only purpose for which it can in the future be reasonably used.

5. Assuming that the flow of house drainage from the premises of the appellants, and from other houses in the neighborhood owned by third persons, never owned or controlled by the appellants, has in the course of that long period, rendered the water in the stream or drain impure, such impurity has caused no detriment to the appellees, and its continuance would cause them none in the future.

6. If such impurity from said cause might in the future be detrimental to the appellees, they have no right to ward off such anticipated injury by filling up the drain or stream to the level of Mount Royal avenue, without making adequate provision for carrying off the water in said stream from the dominant heritage of the appellants; the effect of such filling up being to impede and interrupt the natural flow of the water and prevent its free and natural passage, so that it is thrown back on the dominant heritage.

7. It was the duty of the owners of the lands to the east to make suitable provision for carrying off said water before beginning to fill up their respective lands. The owners of the Bond and Callow lands have recognized that duty by attempting to provide for the water therein, but made inadequate provision for carrying off the water of said stream, which first caused it to be obstructed and thrown back to the lands to the westward until the pond was formed on the appellants' land.

8. The stream was filled up and obstructed and thrown back on the land to the west of the Bond and Callow lands, and ultimately on the lands of the appellants, not because of any impurity of the water, or in the assertion of any right to obstruct it and throw back the water in the stream upon the land of the appellants, for that cause, but was the result of the failure to make adequate provision for the flow of said water when the filling up was done.

9. If "human sewage" now flows into the stream or drain, the appellees may have the right to enjoin those who cause or permit it. They can not inflict injury upon the appellants for a wrong done to them by others. They cannot, by maintain-

ing their obstructions in the stream on their lands, destroy the appellants' easement of the natural flow of water in the stream, to the utter ruin of their inheritance, because third persons may have wrongfully caused or permitted human sewage to flow into the stream.

10. The opening up of the stream by removing the obstructions in and over the same, on the appellees' lands, would not cause a public nuisance as assumed in the decree.

11. If the water in the stream, descending in its natural flow over the lands of the appellees, in its original channel, after the removal of the obstructions, would, from its present condition, be a nuisance to them, they might enjoin those who caused it, but have no right to maintain said obstructions wrongfully placed therein.

12. The appellants have not by any laches or neglect or acquiescence on their part lost their right to the relief by them prayed.

*Frank Gosnell* (with whom was *T. M. Lanahan* on the brief), for W. H. Grafflin *et al.*, and *Henry H. Hubner*, for Central Trust Co. *et al.*

1. The most that the appellants claim is the right to flow the stream across the lands of these appellees polluted by drainage from about fourteen dwelling-houses built upon their property, which right to pollute is claimed by prescription. It is clear, however, that the stream is polluted to such an extent as to create a *public nuisance.*

That the injunction would not have been granted had these facts been disclosed in the bill goes without saying. The fact is that the pollution creates a *public nuisance.* *West Arlington Improvement Company* v. *Mt. Hope,* 97 Md. 191; *Woodyear* v. *Shaefer,* 57 Md. 1; *Davidson* v. *Hutchison,* 44 N. J. Eq. 474; *Water Supply Company* v. *City of Potuin,* 43 Kansas, 404; *Phelps' Equity,* sec. 257; *Gould on Waters,* 2nd ed., sec. 532; *Blackburne* v. *Somers,* L. R. Ir., 5 Eq. 1; *Beard* v. *Murphy,* 37 Vt. 104; 1 *Morgan's Vade Mecum,* 180; 2 *Hill on Torts,* 94, 96.

2. The appellants have no prescriptive right to flow the water in its present volume or polluted state over the lands of these appellees.

3. The proof is by no means clear that the water-course mentioned in the evidence ever ran across the property of these appellees, for such period as to entitle the appellants to recover.

4. That the alleged obstruction of the stream was without the knowledge or consent of these appellees, and no notice whatever was given to them to remove the same. Moreover, The Central Trust Company did not acquire its property until after the erection of the alleged obstruction. *Lion* v. *Balto. C. Ry.*, 90 Md. 275; *Banks* v. *Manion*, 87 Md. 69; *Picket* v. *Condon*, 18 Md. 413; *Penruddock's case*, 5 Coke, 101; *Wood on Nuisance*, secs. 832, 838, 791, 795; *Johnson* v. *Lewis*, 13 Conn. 303; *Conhocton* v. *R. R.*, 51 N. Y. 573; *Dodge* v. *Stacey*, 39 Vermont, 558. "If a person, who has not constructed a work which is a nuisance or causes damage, comes into possession of it, he is entitled to knowledge or notice of its injurious character and an opportunity to abate it before he can be held liable." *Guest* v. *Church Hill*, 90 Md. 689, 695.

*Richard Bernard*, for L. E. Hanna *et al.*

FOWLER, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court of Baltimore City.

The plaintiffs are trustees under the will of the late Chauncey Brooks, and the defendants are the owners of various lots and tracts of land in Baltimore City.

The bill alleges that the plaintiffs, as trustees, are the legal owners of a tract of land of 25¾ acres in Baltimore City bounded on the north by Druid Hill Park, on the south by Whitelock street, on the east by the centre line of Bolton street and on the west by the easternmost line of Eutaw Place; that there has always been a water-course over said and fed by springs, beginning originally at a point on said

land about 150 feet east of the east line of Madison avenue
and about 240 feet southeasterly from the southeast line of a
street laid out on said land called Brooks street, shown on
the plat used at the hearing, and flowing thence in an easterly
direction over the land of said Brooks a distance of 1400 feet
to the eastern boundary thereof; thence over the land next
adjoining on the east, now owned by the defendants, Freder-
ick W. Feldner, the Safe Deposit and Trust Company of Bal-
timore, trustee, Frederick M. Rice, Philip Vogle and other
defendants, 420 feet to the land now belonging to the de-
fendant, the Gray Improvement Company and other defend-
ants; thence still easterly over the land formerly owned by
Wm. Callow to the land now owned by the defendants, N.
P. Bond, trustee; and thence in same direction on the land
formerly belonging to the Bond estate to Mt. Royal avenue,
and thence under that avenue through a culvert to Jones'
Falls.

The bill further alleges with great particularity the man-
ner in which and the times when the various defendants by
means of work done on the lands owned by them respectively,
so obstructed the flow of the water in the stream we have
mentioned that a large pond of stagnant water has been
formed on the lands of the plaintiff; that the water by means
of the obstructions complained of has already been forced
back 175 feet west of the east line of plaintiffs' land covering
about three-fourths of an acre rendering it wholly valueless
and causing a nuisance and irreparable damage to the plain-
tiffs. The prayer of the bill is for an injunction prohibitory
and mandatory against all the defendants from furthur ob-
structing the flow of the water of said stream; and command-
ing them to remove the said obstructions on their respective
lands, &c., and for other and further and general relief. On
4th October, 1902, a preliminary injunction wes issued as
prayed. The defendants answered setting up various de-
fenses. Most of them have denied that they have ever done
anything on their respective lands which caused any obstruc-
tion and set up as a defense that the plaintiffs have themselves

polluted the stream or allowed others to do so by permitting sewage to flow into it, and that they should not, therefore, be afforded any relief by a Court of equity.    Several of the defendants allege that the obstructions complained of and alleged to be on their lands respectively were caused by the Mayor and City Council of Baltimore dumping ashes, street cleanings and garbage thereon and the Mayor and City Council in its answer admits that it is using the defendants' lands, with their permission, but denies that it is creating any nuisance. Some of the defendants rely on and plead certain matters which will be considered later on in this opinion.

The Court below on the bill, answer, evidence and argument decreed that the preliminary injunction should be dissolved and dismissed the bill.    From this decree the plaintiffs have appealed.

The case was fully argued by the able counsel of the respective parties, and although the situation presented by this appeal is somewhat difficult and perhaps in some of its aspects in a measure different from most cases involving the reciprocal rights of owners of land through which water-courses flow, yet we think the general principles which must govern the decision of this case have been settled.

In spite of the denials of some of the defendants, the existence and general course of the natural stream mentioned in the bill is abundantly established by the testimony.    This was virtually conceded at the hearing, and the argument of the defendants was that even if there was such a natural stream formerly flowing through the plaintiff's lands, and even if the defendants or some of them had obstructed it, yet a Court of equity would not grant the plaintiffs the relief prayed, to wit, the restoration of the stream to its original bed because "the water drained into the stream is greatly polluted by sewage and that the maintenance of an open ditch or drain through the defendant's property would constitute a public nuisance." It requires no authority for the proposition that the plaintiffs were entitled to have the natural stream which flowed through their lands continue in its natural course, at least so far that

its obstruction would cause neither them nor their land any injury. And while the argument of defendants concede this, they say that the plaintiffs have themselves polluted or permitted the stream to be polluted by sewage.

The plaintiffs answer this position by conceding that the house drainage in contradistinction to closet or "human" sewage, from certain houses on Madison avenue drained into the stream from the time they were erected by the late Mr. Brooks in 1876. We find no satisfactory evidence in the record that the plaintiffs have caused or permitted the privy wells or water closets to be drained into the stream. One of the defendants (Thos. E. Bond) testified that in 1891 or 1893 the water was clear, no discoloration or odor from it; "we had to cut through the stream to straighten it and were constantly working in the water, and afterwards when we dug a shaft and went down nearly fifty feet under ground, there was no smell from the water at all down in the shaft." This evidence demonstrates not only that the house drainage was not, of itself a nuisance, but also that there was not certainly at that time to the extent claimed by defendants in existence the general emptying into the stream of privies or water closets. There is also some testimony tending to show that closet and privy drains were carried into the stream. But if there was any such pollution of the stream from the source last named there is no convincing evidence that it was caused by the plaintiffs. We think, therefore, it may be assumed that whatever pollution of the stream existed, if any, on the part of the plaintiffs, was such as resulted from the ordinary house and kitchen drainage.

And this brings us to the question whether such a use of the stream is. a proper and legal use under all the circumstances of this case. We have said that the right of the riparian owner to have the water of a stream come to him in its natural purity, or in the condition in which he has been in the habit of using it *for the purposes of his domestic use or of his business*, is as well recognized as the right to have it flow to his land in its natural quantity. *Goodyear* v. *Schaeffer*, 57

Md. 1. But "all abstract rules are subject to considerable modification when they are applied to the exigencies of human life." *Helfrich* v. *Catonsville Water Co.*, 74 Md. 275. While we do not mean by anything we shall say, in any manner, to modify or limit the general rule so well settled here and elsewhere, which prohibits the pollution of streams which are used for drinking and for domestic purposes, yet it must be conceded that a use which under some circumstances would be proper and reasonable, would not be so under others. In the country remote from the urban and suburban localities it would be a misdemeanor and should be declared to be a serious crime to wilfully pollute the pure waters of the streams which are used generally for domestic purposes. But we have before us a very different kind of a stream. For more than twenty years some of the house drainage from Madison avenue and other streets in that locality has been carried into it. During all this time it appears to have been the object of those through whose lands this stream passed to make some arrangements, however imperfect, to pass the water on without using it for any purpose whatever. Indeed the testimony is that most of the defendants have buried the stream from 40 to 60 feet under the surface of their respective lots as now graded. Under these circumstances can it be said that the use of the stream by the plaintiffs as a drain for house sewage (not from water closets and privy wells) is an unlawful use?

In the *Mayor, &c., Balt.* v. *Appold*, 42 Md. 457, this Court said that the limits which separate the *lawful* from the *unlawful* use of a stream, it may be difficult to define, and that it is impossible to lay down a precise rule to cover all cases. "It is not under all circumstance an unreasonable or unlawful use of a stream to throw or discharge into it waste or impure matter * * * The size and character of the stream, *the uses* to which it can be or is applied, the nature and importance of the use claimed and exercised by one party, as well as the inconvenience or injury to the other party would be subjects involved in the inquiry." *Angell on Water-courses,* sec. 140D; *Atty. Gen'l* v. *Gee*, L. R., 10 Eq. 131, 137.

Without further comment upon the conceded use by the plaintiffs of the stream as a drain in the manner indicated, we are of opinion that they had a legal right so to use it for that purpose and it, therefore, follows that their conduct in this respect will not of itself, disentitle them to the relief in a Court of equity.

It should be noted in passing that the obstructed water— some of it certainly (if the evidence is to be credited) is the water of a natural stream—and therefore the rule which might govern as to surface water exclusively would have no application—especially if as we have said, the plaintiffs were lawfully using the natural stream to the extent indicated, as a drain for surface water. It is said in the case of *Jessup* v. *Bamford Bros. Mfg. Co.*, 66 N. J. L., 641 (58 L. R. A. 329), that LORD TENTERDEN had forcibly expressed the legal idea when he declared that "surface water was the common enemy which every proprietor may fight and get rid of as best he may." And this seems to be the rule which has been adopted in some of the States ; but it does not prevail to that extent in Maryland. Thus in *Phil., Wil. & Balt. R. R. Co.* v. *Davis*, 68 Md., the injury complained of resulted from an obstruction of *surface water* which had formerly found an ample outlet, and it was held the plaintiff was entitled to recover for injury caused by obstructing the flow of *surface water* and that a proper outlet or culvert must be provided, of ample capacity to carry off the water, so that it may not be obstructed and thus accumulated on the upper and adjacent lands of other persons. And to the same effect in *Balto. & Sparrows Point R. Co.* v. *Hackett*, 87 Md. 299, where it was held that the defendant having obstructed the flow of the surface water, was bound to provide adequate ditches or culverts for its passage so that the adjacent land should not be injured.

We are, therefore, of opinion that in the first place, the stream in question is or was, before it was obstructed, a natural stream; *second*, that under the evidence in this case the use of the stream for house drainage was reasonable and legal.

But there are other defenses in addition to those we have

considered, which have been interposed by some of the defendants. Thus the Central Trust Co. and some others, perhaps, contend that the obstructions were made before they purchased and that, therefore, under the rule applied in *Lion v. City Pass. Rwy. Co.*, 90 Md. and other cases they must have had notice of the injury and opportunity to abate the nuisance before suit can be brought. But we are of opinion that if it is not absolutely established by the evidence, yet it is sufficiently so for all practical purposes that the stream in question before it was obstructed passed over or through the tracts or lots owned by the defendants and that they have either made, contributed to, or allowed the obstructions complained of to be made. In either event there would be no necessity of giving the notice relied on by the defendants. The defendants, Grafflin and Buck, contend that the stream did not cross their lots at all; but they (the lots), are located on one of the plats in the record and the witness, F. E. Pegram, proved the title to these lots was in them. It may be conceded that at some points and on some of the lots of the defendants it may be difficult if not impossible now to designate the exact location of the bed of the natural stream. But this difficulty if it exists grows out of the acts of the defendants in grading their land. Hence they and not the plaintiffs must be subjected to the inconvenience and expense resulting from the grading or from the imperfect means adopted to carry the water off.

In conclusion it seems to us that this is an especially proper case for a Court of equity. Indeed it is difficult to see how the plaintiffs could get adequate and complete relief in any other Court. While a separate suit at law against each of the defendants would be necessary and while even if any one or more of the defendants were ready and willing to re-open the stream in some reasonable and satisfactory way, they would not be able to act without the concurrence and active co-operation of all. Under such circumstances only a Court of equity can afford relief suitable to the exigencies of the case.

It does not necessarily follow, however, that, as held below,

no relief could or should be granted the plaintiffs, because the water of the stream being polluted by sewage the maintenance of an open ditch or drain would constitute a public nuisance. The plaintiffs ask for certain specific relief and for general relief. What they want and what we have said they are entitled to is some action on the part of the defendants which with the least inconvenience and cost to them, will result in carrying the accumulated water off the plaintiffs land. If in the first instance the defendants had constructed proper sewers, drains and culverts before grading, the present difficulty would not exist, but whatever the difficulties, if not practically insuperable, they must be overcome and the obstructions removed if relief cannot be afforded in any other way. But there is no reason, if proper and adequate outlet be constructed to carry off the water why the defendants should not grade their land as they see proper so as to fit it for building purposes.

> *Decree reversed and cause remanded*
> *with costs to the plaintiffs.*

(Decided January 15th, 1904.)