TURNER ET AL. *v.* WASHINGTON SUBURBAN SANITARY COMMISSION ET AL.

[No. 131, September Term, 1959.]

*Decided February 18, 1960.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*R. Edwin Brown,* with whom was *Charles W. Bell,* on the brief, for appellants.

*J. Lloyd Niles,* with whom was *John B. Kenkel,* on the brief for Washington Suburban Sanitary Commission et al., part of the appellees, and *John P. Moore,* with whom were *Moore & Linowes,* on the brief for O.F.C. Corporation, appellee.

HENDERSON, J., delivered the opinion of the Court.

The appellants, plaintiffs below, brought an action at law seeking damages both compensatory and exemplary for trespass to real estate against the defendants below, O.F.C. Corporation, the Washington Suburban Sanitary Commission, and the individual commissioners, appellees here. The declaration also sought injunctive relief. The court below refused to grant a temporary restraining order, and the case came to trial before a jury, which returned a verdict of $8,730.00 against O.F.C. There was a directed verdict in favor of the other appellees. On motion by the defendant O.F.C., for new trial or judgment *n.o.v.,* the court granted the motion for new trial unless the plaintiffs should remit the sum of $7,230.00. The court also entered an order denying injunctive relief. The plaintiffs filed the remittitur, reserving and claiming, however, a right to appeal "from the judgment of the Court denying their motion to enter judgment" for the amount of the jury's verdict "and to insist that the Court of Appeals of Maryland shall enter judgment" for such amount. Final judgments were entered against O.F.C. in the sum of $1,500.00, and in favor of the other defendants for costs. The plaintiffs appealed. There was no cross-appeal.

It appears that the plaintiffs, the Turners, acquired a ten-acre tract of land in Montgomery County in 1947, fronting on State Route 97, known as Georgia Avenue extended. The rear portion of the tract, containing about six and two-thirds acres, was condemned for a school site in 1956. In 1955 the O.F.C. Corporation began to develop the contiguous properties lying to the north and south of the Turners' property, referred to as the Hartley and Stroup properties, respectively, and likewise fronting on Route 97 to the east. The natural slope of the lands is from north to south, and there is a natural depression or swale eighty feet wide across the rear portion of the three and one-third acre tract retained by the Turners, where they conducted a restaurant business until 1955 when they leased the property. Surface water coming onto the Turner property from the Hartley property is carried off by "yard traps" into a creek or branch of the Potomac River.

In planning its development, O.F.C. designed and dedicated Loyola Street, fifty feet wide, to run to the Turners' north boundary and pick up again at the Turners' south boundary, at about the location of the swale. It proposed to carry its sanitary sewer system across the Turner property at this location, and also to install a storm drain system to carry off surface waters. These plans were approved by the Sanitary Commission, but the commission expressly advised O.F.C. that it assumed "no responsibility for damages to lower landowner", in connection with the proposed storm drain. In connection with the sanitary sewer, the commission instituted a condemnation proceeding to obtain an easement across the Turner property, but this was abandoned after verdict. Thereafter, the commission constructed a sanitary sewer along the south side of the Hartley tract to Georgia Avenue extended, across the public road to its east side, along the road in front of the Turner property, and again across the road to connect with the sewer in Loyola Street on the Stroup property.

The case against the Washington Suburban Sanitary Commission rests upon this installation of the sanitary sewer. It was stipulated that the Turners hold record title to the bed of Georgia Avenue extended for a distance of about 509 feet in front of their property, subject to any rights the public may have therein, but the extent of these rights is far from clear. By an Act of the General Assembly passed on February 27, 1850, (Ch. 358 Acts of 1849) the Union Plank or Turnpike Road Company was incorporated, and authorized to construct a plank or paved road in the bed of existing public roads, with the consent of another turnpike company and the County Commissioners of Montgomery, Howard and Anne Arundel Counties, and to alter their grade and course. A general power of condemnation was granted where it should become necessary to "occupy new ground". Union instituted a condemnation suit against the Turners' predecessors in title, but we were informed at the argument that these papers have been lost. In 1913 the Turnpike Company, by duly recorded deed, conveyed all its rights in Georgia Avenue extended to the

State Roads Commission, which improved it, and has maintained it ever since, as a state road.

The appellants contend that the Turnpike Company obtained only an easement of public travel, and since Georgia Avenue extended was only a country road at the time of the condemnation of the easement, the laying of a sanitary sewer in its bed is an additional servitude for which they should be compensated. They rely upon *Water & Electric Co. v. Dubreuil,* 105 Md. 424. It was held in that case that an injunction was properly issued to restrain the Water Company from laying water pipes in the bed of Lake Avenue, in Baltimore County, on the ground that this constituted an additional servitude. Lake Avenue was a public road, although admittedly of a rural character, but it was shown that the complainants, abutting landowners, owned the fee to the center of the road, including the portion thereof in which the pipes were proposed to be laid. The court recognized a distinction between streets in a town or city, and country or rural highways. In the former, it was said to be universally recognized that the laying of gas or water pipes would not be an additional servitude. The distinction has been criticized as "fanciful" and unsound. See 3 Nichols, *Eminent Domain* (3d ed.), §§ 10.1 [1], 10.4 and 10.4 [1]. See also 12 McQuillin, *Municipal Corporations* (3d ed.), § 34.118.

In the *Dubreuil* case the court found as a fact that the pipes proposed to be laid in Lake Avenue were not designed to serve abutting owners, but to carry a water supply to a distant point. It also found as a fact that the proposed use was not reasonably within "the scope of the original easement", but in this connection the court said (p. 428) : "The tribunal whose duty it is to determine the question is not to be governed alone by the mode of user first adopted, or by the conditions existing at the time the highway is acquired by the public." The court further said (p. 432) : "There is nothing in our decisions that indicates that laying gas or water pipes under what was originally a mere rural highway, after it becomes built upon and populous, like an ordinary street in a town, can be said to be 'outside the scope of the original easement,' * * *." And (at p. 434) : "There are places on the

plat filed, * * * where houses have been erected in such numbers and in such proximity to each other as would justify the application of the rule which governs streets in cities and towns,".

We think the sentence last quoted is applicable in the instant case. It was stipulated that the area surrounding the Turner property, which was once rural, is now a fairly well populated area undergoing further development. It is suburban, rather than rural, in character, and the sewer in question is designed to serve public needs of the abutting owners and the expanding community, in a matter directly related to the public health. It may also be observed that sewer disposal, through pipes, is itself a form of public transportation. The Washington Suburban Sanitary Commission was created by Chapter 122, Acts of 1918. There can be no question of the legislative power to create such a corporation and invest it with appropriate powers to carry on its work essential to the health and welfare of the people of the designated district. *Neuenschwander v. Washington Suburban Sanitary Comm.,* 187 Md. 67, 75. Under section 18 of that Act it was authorized to construct and maintain water mains, sewers or drains in any public road without permit or the payment of any charge. We think the *Dubreuil* case is distinguishable from the instant case on the facts.

Since we hold that the Commission did not exceed its powers, or infringe upon the rights of the Turners, in laying and maintaining the sewer in the bed of Georgia Avenue extended, no liability can attach to the individual commissioners. See *Smith v. Stephan,* 66 Md. 381, 389, and 4 McQuillin, *Municipal Corporations* (3d ed.), § 12.208. We find no error in the action of the trial court in directing a verdict in favor of the Commission, and the commissioners individually.

The case against O.F.C. is based upon the channeling and discharge of silt and debris upon the Turner property, through the construction of pipes, drains and ditches designed to concentrate surface water and carry it across the Turner property underground. O.F.C. made no effort to obtain an easement for that purpose, other than to write one letter requesting that an easement "over 7,398 square feet of your property",

in a suggested extension of Loyola Street, be granted to it without charge, O.F.C. undertaking to pay the cost of preparing and recording an appropriate instrument. Nothing was said about the cost of installing the storm drain across the Turner property if the easement were granted but presumably O.F.C. was prepared to pay for that. This letter was not answered. O.F.C. continued with its storm drain plan, the only change being that it moved the drainage outfall back from the boundary line about one hundred feet, and channeled the discharge from the whole system into an open ditch leading directly to the swale. Evidence was produced to show that the result was to increase the flow into the swale, choke the "yard traps", and cause a deposit of silt and debris far in excess of the natural drainage. That this was an actionable wrong is not denied. See *Battisto v. Perkins*, 210 Md. 542, 546, and *Kennedy-Chamberlin Development Co. v. Snure*, 212 Md. 369, 376. Nor do the appellants now contend that there was any error in the court's charge as to compensatory damages, although they press their objection to the court's instruction that the evidence was insufficient to support their claim for punitive damages. There was testimony that the property could be restored to its original condition for about $1,000.00, although there was other testimony that, by reason of the installation of the storm drainage system and channeling of storm waters, there was a diminution in the value of the plaintiffs' property to the extent of some $29,000.00. Other testimony was to the effect that there was no diminution in value, and that if the property was devoted to its highest and best use, an underground storm drain would be essential, and a benefit to the property. The appellants main contention is that the court invaded and usurped the function of the jury in passing its order that the plaintiffs remit or submit to a new trial, and that the court thereby denied to the plaintiffs their constitutional guarantee of trial by jury under Art. 5 of the Maryland Declaration of Rights, and Art. 15, sec. 6 of the Maryland Constitution. They also ask us to find that the trial court abused its discretion, and to reinstate the jury's verdict.

The trial practice of granting a new trial sought by the

defendant, unless the plaintiff remit a portion of the verdict which the trial court deems excessive, is well established in Maryland. It is referred to without the citation of authority in 2 Poe, *Pleading and Practice* (Tiffany's ed.), § 347. In *Attrill v. Patterson,* 58 Md. 226, 260, the amount remitted was the excess over the amount claimed in the declaration, and this was approved on the authority of *Harris v. Jaffray,* 3 Harris & J. 543, Poe (cited above), and a statute, the predecessor of Code (1951), Art. 26, sec. 15, now incorporated as Maryland Rule 641. But in *Brawner v. Hooper,* 151 Md. 579, it was held in a negligence case that the court properly passed an order granting a new trial, on motion of the defendant, unless the plaintiff remitted $2,500.00 of a $5,000.00 verdict. It was held error, however, for the court to rescind the order and deny the motion for new trial after the plaintiff had remitted, in accordance with a condition imposed by the court that the defendant abandon his right of appeal. To the same effect, see *Baltimore, C. & A. R. Co. v. Turner,* 152 Md. 216, 231. Cf. *Francies v. Debaugh,* 194 Md. 448, 460. In *Mezzanotte Const. Co. v. Gibons,* 219 Md. 178, 183, we held that after the plaintiff had remitted about half of a verdict rendered in an action for trespass and cutting timber, the defendant could appeal from the judgment so entered. We declined to pass on the plaintiff's contention, that the order for remittitur was improper, in the absence of an appeal or cross-appeal by him. We said (p. 183): "The attempted reservation of a right to appeal is not significant. Whether the plaintiff would have had a right of appeal, with or without reservation, is a question we do not reach, because the plaintiff did not appeal, or cross-appeal."

The constitutionality of the practice of remittitur does not seem to have been squarely raised or decided in the cases cited. Whether it is properly raised in the instant case may be open to question. It does not appear that the point was "reserved" in the "remittitur" filed in the trial court, or argued in the court below. See Maryland Rule 885. In its brief in this court no relevant authorities *pro* or *con* are cited by either party on the constitutional point. For present purposes, however, we will assume that the point is jurisdictional

and properly before us. In *Brawner v. Hooper, supra,* the action of the trial court was challenged by the defendant's motion to strike the judgment. It was held that the trial court exceeded its jurisdiction in annexing the condition that the defendant abandon his right of appeal, and that this condition was void. The plaintiff having remitted, this court entered judgment for the reduced amount.

To answer the contention that the court usurped the jury's function, resort must be had to the appropriate rules of the common law at the time our first constitution was adopted. *Knee v. Baltimore City Pass. Ry. Co.,* 87 Md. 623, 624, 633. It would seem that the practice of remittitur was not unknown at that time. See Wayne, *Damages* (11th ed.), p. 635. It was recognized by Mr. Justice Story in *Blunt v. Little,* 3 Mason, 102, 107, and has been consistently upheld by the federal courts. Indeed, it may be said that the practice is as much an incident and corrective of jury trial as the right of a trial court to set aside a verdict on the ground that it is against the evidence, or against the weight of the evidence. Cf. *Snyder v. Cearfoss,* 186 Md. 360, 368. The plaintiff is not obliged to remit. He has the option of accepting the alternative and trying the case again. As expressed by some of the commentators, the right to jury trial is a right to a "properly functioning" jury. See Carlin, *Remittiturs and Additurs,* 49 W. Va. L. Quar. 1, and Comment in 44 Yale L. J. 318. In *Dimick v. Schiedt,* 293 U. S. 474, the Supreme Court, in an opinion by Mr. Justice Sutherland, held that under the federal practice an additur was not proper. There was a vigorous dissent by Mr. Justice Stone, concurred in by Chief Justice Hughes, and Justices Brandeis and Cardozo. It seems to have been agreed by all the Justices, however, that the long established practice of remittitur did not impair the right to trial by jury under the seventh amendment. See the note on this case in 21 Va. L. Rev. 666. See also 39 Am. Jur., *New Trial,* § 213, and notes 53 A.L.R. 779; 95 A.L.R. 1163. We find it unnecessary to review in detail the authorities cited in the *Dimick* case in support of the proposition. We find no violation of the plaintiffs' constitutional rights in the instant case.

In so holding we have assumed that the plaintiffs had a right to appeal, at least for the purpose of attacking the jurisdiction of the trial court to pass the order in question. Whether the plaintiffs have a right to a review of any other questions is not free from doubt. It is perfectly clear that no appeal lies from the granting or refusal of a new trial, if the trial court has given judicial consideration to the matter presented by the motion. *Von Schlegell v. Ford,* 167 Md. 584, 593; *Snyder v. Cearfoss, supra; Hill v. Coleman,* 218 Md. 1, 2. On the other hand, it is the general rule that a plaintiff, dissatisfied with the amount of a verdict, is not precluded from appealing merely because the judgment on the verdict is in his favor. *Baer v. Robbins,* 117 Md. 213, 225; *Jenkins v. Spedden,* 136 Md. 637, 642, cited in the *Mezzanotte* case, *supra.* But it has been held in many states that, where the plaintiff remits and consents to the entry of the judgment for a reduced amount, he waives his right to appeal. *McDaniel v. Hancock,* 43 N. W. 2d 68 (Mich.); *Rockafellow v. Streeter,* 51 N. W. 2d 249 (Mich.); *Von Essen v. Vos,* 53 N. W. 2d 577 (Mich.). To the same effect, see *Sergeant v. Watson Bros. Transp. Co.,* 52 N. W. 2d 86 (Iowa); *Lyric Amusement Co. v. Jeffries,* 120 P. 2d 417 (Ariz.); *Carver v. Missouri-Kansas-Texas R. Co.,* 245 S. W. 2d 96 (Mo.). See also *Florida East Coast Ry. Co. v. Buckles,* 92 So. 159 (Fla.), and note 39 L. R. A. (N. S.) 1064, 1071. In a few states statutes have been adopted enlarging the scope of appeal. See note 24 Tenn. L. Rev. 1155. In at least two cases the Supreme Court held that a remitting plaintiff was not entitled to reinstatement of the jury's verdict. *Lewis v. Wilson,* 151 U. S. 551, 555; *Koenigsberger v. Richmond Silver Min. Co.,* 158 U. S. 41, 52. It has been further held that this is true even where the remittitur was filed under protest. *Koenigsberger v. Richmond Silver Min. Co., supra; Carver v. Missouri-Kansas-Texas R. Co., supra; Florida East Coast Ry. Co. v. Buckles, supra.* In some of the cases cited the denial of appeal, or review, was based on the ground of estoppel, rather than waiver. It was reasoned that by accepting the lesser amount the plaintiff prevented the defendant from ob-

taining the new trial which the trial court had conditionally granted.

In the instant case we think the plaintiffs, by accepting the lesser amount, are precluded from arguing that the trial court abused its discretion in eliminating the amount which it deemed excessive, and that they are not entitled to have the jury's verdict reinstated. We think this holding is in accord with the great weight of authority. A more difficult question is presented in regard to the contention that the trial court erred in charging the jury that there was no basis in fact for an award of punitive damages, to which the plaintiffs seasonably objected. In a sense, the alleged error can be said to be one of law rather than of fact, although the ruling was predicated upon a lack of evidence to support the plaintiffs' prayer for punitive damages. If the prayer had been granted, it is arguable that the jury might have awarded a larger verdict than it did, and that the trial court would have been bound to consider that element of damage in considering whether that verdict was excessive. On the other hand, if the plaintiffs are precluded from challenging the quantum of the judgment for compensatory damages, which they have accepted, it would seem anomalous to hold that they were entitled to a new trial on the bald question of punitive damages. We are aware of no authority that would permit such a severance. Cf. *Groh v. South*, 121 Md. 639, 642, and *Schloss v. Silverman*, 172 Md. 632, 642. In accepting the sum named, we think the appellants are precluded from challenging the method of its computation. Moreover, the plaintiffs are somewhat inconsistent in asking that the jury's verdict be reinstated, and at the same time that we find error in the refusal of the prayer for punitive damages "and so rule for its future edification." Reinstatement of the jury's verdict and entry of a judgment thereon, if granted as prayed, would seem to preclude a remand for retrial on the issue of punitive damages, which could hardly be decided *in vacuo*.

There is also a certain inconsistency between the plaintiffs' contention that there was error in the denial of punitive damages, and their insistence upon a right to injunctive relief. In theory, the right to have the jury consider and award

a sum to punish the wrongdoer is that it may act as a deterrent to him and others from a repetition of the wrongful and outrageous conduct. *Superior Const. Co. v. Elmo,* 204 Md. 1, 14; 1 Sedgwick, *Damages* (9th ed.), § 360; Prosser, *Torts* (2d ed.), § 2, p. 9. In the *Elmo* case, Judge Hammond for the Court, on reargument, held that an equity court had no power to award punitive damages. There was an intimation (p. 19) that a plaintiff who invokes equity jurisdiction to obtain an injunction waives the claim for punitive damages. Perhaps the same rule should apply where he seeks, in an action at law, the injunctive relief formerly available only in equity, under Code (1957), Art. 75, secs. 61-68. See also Maryland Rule 1250 d, and *Dundalk Holding Co. v. Easter,* 215 Md. 549, 554. It is clear that the issuance *vel non* of the injunction prayed is governed by general equitable principles. It may be argued that at some point an injured party is put to an election between punitive damages and injunctive relief. But since we rest our ruling as to punitive damages on another ground, we leave the question open.

We think the trial court erred in denying injunctive relief. Presumably, the award of compensatory damages did not include prospective damages subsequent to the time of the institution of suit (or perhaps the time of trial, we need not now decide which), yet, so long as the channeling and discharge of water is suffered to continue without abatement, there is the strong probability of future damage, and the prospect of future actions at law, which would make equitable relief singularly appropriate. For a discussion of the problem, see *Spaulding v. Cameron,* 239 P. 2d 625 (Cal.), cited in the *Battisto* case, *supra,* and *Restatement, Torts,* § 930. We are not persuaded by the trial court's statement that there is no way in which the exact quantity of increased flow could be determined. It is enough that there was a material increase. The wrongdoer may not apportion his own negligence. *Laird, Rock & Small, Inc. v. Campbell,* 200 Md. 627, 632. Equity sometimes applies the rule of "comparative hardship", *Dundalk Holding Co. v. Easter, supra,* but usually in cases of innocent mistake. In cases relating to surface waters, this Court has frequently stated and applied the "reasonableness

of use" rule. *Whitman v. Forney,* 181 Md. 652; *Biberman v. Funkhouser,* 190 Md. 424; *Bishop v. Richard,* 193 Md. 6; *Hancock v. Stull,* 206 Md. 117; *County Comm'rs of Baltimore County v. Hunter,* 207 Md. 171. In some cases the equity court has required the injured party to permit entry upon his lands to make repairs and open drains. On remand, the trial court may properly consider expert testimony as to whether some modification of the storm drainage system might disperse the flow and prevent the wrongful concentration and discharge of surface waters, and whether disposal could reasonably be made at some other point. We do not suggest the exact form of relief, but we think it was not reasonable for the trial court to refuse any injunctive relief against the recurrence of an injury which admittedly caused substantial damages in the past, without a showing of reasonable efforts to correct it.

> *Judgments affirmed, and case remanded for further proceedings relative to injunctive relief, costs to be paid equally by the appellants and the appellee, O.F.C. Corporation.*